UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
_____

**UNITED STATES OF AMERICA**,


   -v-                               Case No. 22-CR-358 (RC)

**KATELYN BARTOW**,

                      Defendant.
_____


<u>**DEFENDANTS MEMORANDUM IN AID OF SENTENCING**</u>


<u>Introduction</u>

The events of January 6, 2021 and the aftermath have revealed many things. One of those things that has become unmistakably clear is that January 6 protestors turned January 6 defendants, are not a monolith or a homogenous group. Ideological or political narratives (from either side, it should be said) might paint with a broad brush, and simply.  The truth, unsurprisingly, is more complex.  There were people at the Capitol that day whose actions were dastardly, and who deserve the lengthy terms of imprisonment they have received.  And just as surely, there were people whose motivations were different, and whose transgressions were far more limited, and actions much less noxious.  Neither heroes nor villains.

When Ms. Bartow's conduct – what it was, and what is *not* – is set against the deeper backdrop of her extraordinary life and constitutional makeup, it becomes apparent that prison or jail is unnecessary.  This is not to say that she does not have much to answer for.  But a sentence of probation that may include some

component involving community service would as sufficiently further the purposes of sentencing as any custodial term. Just as critically, it would promote respect for the law as the product of measured and just contemplation rather than simply as a vehicle to punish and imprison[1]. We do not begrudge DOJ's decision to prosecute Katelyn for her role in what transpired on January 6. But the inevitable result of that process should not be placing her in prison or jail.

Katelyn Bartow respectfully submits this memorandum in aid of sentencing, currently scheduled for January 18, 2022. On July 20, 2023, Ms. Bartow pleaded guilty pursuant to an agreement with the Government to one count of demonstrating, picketing or parading in the Capitol, in violation of 40 U.S.C. § 5104(e)(2)(G). The offense is a Class B misdemeanor, which carries a maximum of 6 months' imprisonment and a $5,000 fine. Sentencing has been scheduled for January 18, 2024, in Washington, D.C. For the following reasons, we respectfully ask the Court to impose a term that involves some additional period of probation and/or community service, but that keeps her out of custody so that she can remain with her young family and continue her extraordinary service to humanity.

### Ms. Bartow's Conduct Outside and Inside the Capitol

The Statement of Offense, to which Ms. Bartow agreed as part of her plea, describes both what occurred on January 6th, 2021 at the Capitol, as well as Mr.

---

[1] As the Supreme Court reminded in *Gall v. United States,* a "sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." 552 U.S. 45,54 (2007); *see also United States v. Stern*, 590 F. Supp. 2d 945, 957 (N.D. Ohio 2008) ("Respect for the law is promoted by punishments that are fair, however, not those that simply punish for punishment's sake.")

Bartow's individual conduct that day.  She traveled to Washington, D.C. in early January 2021, along with several family members, to hear former President Trump's speech at the Ellipse on January 6.  In that now-famous speech, after railing against what he described[2] as a fraudulent, stolen election that resulted in a victory by his political opponent, Trump exhorted the crowd to "fight like hell".  He continued, warning: "And if we don't fight like hell, you're not going to have a country anymore. . . So we're going to walk down Pennsylvania Avenue [] and we're going to the Capitol, and we're going to try and give."  Transcript of Remarks of Donald J. Trump on January 6, 2021, available at

https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.  Earlier in the speech, Trump had remarked:

> Now, it is up to Congress to confront this egregious assault on our democracy. And after this, we're going to walk down, and I'll be there with you, we're going to walk down, we're going to walk down. Anyone you want, but I think right here, we're going to walk down to the Capitol, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them.  Because you'll never take back our country with weakness. You have to show strength and you have to be strong. We have come to demand that Congress do the right thing and only count the electors who have been lawfully slated, lawfully slated.  I know that everyone here will soon be marching over to the Capitol building to peacefully and patriotically make your voices heard.

*Id.*

---

[2] The speech on January 6 of course followed weeks of claims by the administration and its allies that the 2020 Presidential election had been stolen from them.

After the speech (finally) ended, Ms. Bartow, along with her brother, made their way to the Capitol, following the crowd heading in that direction.  Despite telling the crowd that he would "be there with you," President Trump departed for the White House.  Katelyn, meanwhile, arrived outside the Capitol shortly after 2:00 p.m.  By this point, the first wave of protestors had already breached barricades and had started entering into the Capitol itself, breaking windows and doors, and fighting with Capitol police.

Ms. Bartow was not among the first wave.  She appeared to enter the building at approximately 2:24 p.m., after certification proceedings were adjourned and members of Congress in their respective chambers were already under evacuation orders.  She entered the Capitol by walking through a door.  Ms. Bartow had arrived via the Northwest Terrace on the Senate wing of the building, walking up a flight of stairs.  While on or once she reached the top of that exterior staircase, Ms. Bartow encouraged others in the crowd to come up as well, chanting "USA!" This was for a relatively brief period of time.  Once on the terrace, Capitol police, in surveillance footage and homemade video disclosed in discovery, do not appear to be making active efforts to keep the growing crowd, including Ms. Bartow, out of the Capitol building[3].

---

[3] We do not suggest that law enforcement acted improperly in that moment.  Perhaps, given the numbers of protestors and their apparent determination active resistance to detain them or keep them out of the building may have aggravated the situation or resulted in more violence.  Nor are we suggesting that this fact constitutes a defense or justification.  Ms. Bartow has pleaded guilty and accepted responsibility.  But at the point in time when she went into the Capitol, and at that point of entry, police do not appear to have taken measures to stop them.  Likewise, in setting forth former President Trump's remarks earlier that day, we do not suggest any kind of public authority defense. However, it nevertheless constitutes important background and context when considering her conduct overall.

Once inside, Ms. Bartow did not engage in any violent acts or rhetoric, or encourage anyone to do the same. Her actions were to the contrary.  She did not confront or fight the police. She was not part of any group or organization.  She had no weapons, combat or tactical gear, makeshift or otherwise.  She did not leave feces in the Speaker's office.  She left no messages on the walls.  She did not put her feet up on desks or engage in similar acts of disrespect.  She did not engage in any vandalism, or break or deface any property.  She did not enter into private offices, or the House or Senate Chambers themselves, or non-public or sensitive areas.  She did not want to hang Mike Pence (or anyone else).

Her conduct inside the Capitol itself consists of two primary activities.  First, not long after entering, Ms. Bartow proceeds to an area known as the Crypt, and picks up garbage and debris that others (presumably earlier protestors who were less responsible) left behind or toppled over.   This was captured on surveillance video and her own video and posts on social media.  She also encouraged others in the vicinity to do the same and discouraged them from similar acts of destruction or vandalism.  Second, she proceeds downstairs to the Capitol Visitor Center.  A crowd was growing, and tensions with law enforcement in the area were escalating to the point of physical confrontation.  Ms. Bartow took it upon herself to prevent the situation from spiraling out of control.  She interjected, placing herself between the more violent, agitated protestors, and the Capitol police, and kept the peace.  In effect, she self-deputized herself, and warned others not to become violent or simply

be agents of chaos and disorder[4].  She told the crowd that violence was not what they came for.  After being told that upstairs, a protestor had been shot, she assisted in helping to convince people to leave, and then left the area herself.  On one video clip, Ms. Bartow and her brother appear to make a gesture of good will or appreciation to the Capitol police.

If Ms. Bartow's conduct outside the Capitol building – encouraging others to come up the stairs, into the building itself – is an aggravating factor, it is a sin for which her conduct inside the building effectively atones[5].  Outside, she stirred up the rabble a bit, though not to the point of committing any violent, insurrectionary act.  Inside, it was a different story.  She cleaned up the mess others left behind, and exhorted them to do the same.  And in a potentially explosive moment, she served as a peacekeeper and de-escalator.   She diffused tensions between Capitol police and protestors lacking her sense of right and wrong.  She interjected, placing herself between the more agitated, violent members of the mob – and the police. And after someone was shot, she assisted in helping move protestors out of the Capitol.  If everyone behaved as did Ms. Bartow, the events of January 6th, while still troubling, would have taken on an entirely different narrative.

In total, Ms. Bartow was in the Capitol for approximately thirty minutes, before exiting shortly before 3:00 p.m.  Length of time in the building is one

---

[4] As discussed below, a sort of mob mentality can break out in the absence of a common structure or strategy or plan when large numbers of people are together.

[5] Being arrested and prosecuted, and facing up to 6 months in custody apart from her family would be a significant penance as well.

measure of a defendant's conduct the Government has relied upon, and some January 6 defendants certainly were inside for less time.  Some far longer.  But sheer duration itself is an imperfect indicator of culpability.  The more important metric, it seems to defense counsel, is what the person actually did, or did not do, while inside.  Further, it seems safe to say that she left once instructed to do so, and would have been inside the building for less time if it had been easier to leave.  The still gathering throng prevented a quick or immediate exit.  But certainly Ms. Bartow was not among the group who remained to resist the police and ended up detained or arrested.  Ms. Bartow was also cooperative with FBI agents when they interviewed her in February 2021, admitting to her actions.  She spoke with them freely.  She agreed to speak with them again, and did so following her guilty plea in this case, again discussing the events in question and her role in them.

To be sure, Ms. Bartow made some foolish comments on social media both before and shortly after the events in question. But we believe her actions inside the Capitol – picking up trash and keeping the peace – speak louder than the excess or exuberance we see in postings on Facebook or other platforms.  On balance, those statements should not be concerning enough to warrant jail or prison as the only answer here.  Should she have been more vociferously remorseful in the immediate aftermath?  Yes, but her comments were also drawn from her own experience and actions, knowing that she abhors violence and chaos.  Time and distance from the events in question, as well as significant life events, have afforded a perspective Ms. Bartow lacked in the hours and days just after January 6.

Two important and inter-related concepts grounded in sociology played an important role in contextualizing Katelyn's actions that day: the power of the masses and the lies they were told.  Getting swept up in the fervor of what she viewed, rightly or wrongly, as a historic moment does not make Ms. Bartow unique in the universe of January 6 defendants.  If anything, it helps prove the point.  Like many others without a criminal record, the episode appears largely aberrational from her life overall, discussed below.  She has a strong moral compass, and it is far from broken.  It was compromised by incessant lies and manipulation that played directly into her beliefs, and what she wanted to be true.  *See* Eric Hoffer, *The Passionate State of Mind, and other Aphorisms* 137, (1951) ("We usually see only the things we are looking for - so much so that we sometimes see them where they are not".).  This is rooted in mass movement scholarship, and leaders know how to exploit it.  Over a century ago, Gustave Le Bon wrote of how:

> the masses have never thirsted after truth. They turn aside from evidence that is not to their taste, preferring to deify error, if error seduce them.  Whoever can supply them with illusions is easily their master; whoever attempts to destroy their illusions is always their victim. . . . The thing affirmed comes by repetition to fix itself in the mind in such a way that it is accepted in the end as a demonstrated truth.

Le Bon, *The Crowd: A Study of the Popular Mind* 126, 142 (1895).  Crowds are no less vulnerable to bad ideas than are individuals:  "The quality of ideas seems to play a minor role in mass movement leadership. What counts is the arrogant gesture, the complete disregard of the opinion of others, the singlehanded defiance of the world.  Charlatanism of some degree is indispensable to effective leadership."

Eric Hoffer, *The True Believer* 107 (1951).  When we talk about how January 6th could happen and how good, well-meaning people like Ms. Bartow could have bought into what they heard from their leaders, the answer is rooted in history.

Much has been written about January 6 and the so-called "mob mentality," already almost to the point of cliché.  *See, e.g.*, Benedict Carey, *Making Sense of the 'Mob' Mentality*, New York Times (Jan. 12, 2021) available at https://www.nytimes.com/2021/01/12/science/crowds-mob-psychology.html. Sociology scholars have long written about the madness of crowds, and how individuals appear to feed off each other.  Again we look to Le Bon: "Ideas, sentiments, emotions and beliefs possess in crowds a contagious power as intense as that of microbes. . .  In the case of men collected in a crowd all emotions are very rapidly contagious, which explains the suddenness of panics."  Le Bon, *The Crowd*, at 143.

Observing this kind of phenomenon is not solely the province of sociologists. One French novelist, writing in the 19th Century, included a passage describing a kind of peasant riot in a small factory town:  "Then began one of those scenes of massacre and torture, worthy of cannibals, horrible to relate, and the more incredible, that they happen almost always in the presence, and often with the aid, of honest and humane people, who, blinded by false notions and stupid prejudices, allow themselves to be led into all sorts of barbarity, under the idea of performing an act of inexorable justice."  Eugene Sue, *The Wandering Jew*, VOL II 383 (1844). To be clear, we are not speaking here of cannibalism, massacre, barbarity or

torture.  Far from it.  But if ordinary, good people could be driven to *that* level of depravity, it is easy to see how they could be driven to much less, including Ms. Bartow's small part in January 6th, non-violent as it was on her end.

This appears to be what Judge Mehta was getting at when attributing the events in question to "the power of propaganda; the power of being told lies over and over and over again; told by leaders who knew better, that something was taken away from people when it wasn't…the idea that people who have otherwise led modest and humble lives, who have not been political agitators, political activists, are now facing serious jail time is extraordinary."  Transcript of Sentencing Proceedings in *United States v. Andrew Cavanaugh*, August 4, 2022, Case No. 21-cr-362 (APM) [ECF Document No. 41], at 27-28.  We ask the Court to hold onto these thoughts when considering Ms. Bartow's conduct.

## A Probationary Sentence Creates No Unwarranted Disparities

There are now enough prosecutions and sentences arising from the events of January 6 to speak of similarly-situated defendants and the sentences they have received.  January 6 sentencing jurisprudence can become something of a Rorschach test that allows the litigant to see what he/she want to in support of his/her argument, in light of the number of cases to date.  That caveat, however, does not make the exercise useless altogether.  Surely the Government will likewise be able to point to defendants with comparable conduct that received some time in custody.  Maybe even less culpable conduct for some.  But on balance, defendants whose conduct is roughly comparable to or more aggravated than Ms. Bartow's have

generally received non-incarceratory sentences, at least in the presence of the type of compelling life history in mitigation that Ms. Bartow brings to bear. We highlight below just a few examples:

*United States v. Thomas Gallagher*, Case No. 21-cr-41, (24 months' probation and 60 hours community service for defendant who was part of a group (but did not personally) throwing chairs at Capitol Police in Visitor Center and refused to leave, ultimately being arrested in the building);

*United States v. Vinson*, Case No. 21-cr-355, (5 years' probation, 120 hours of community service for married couple with confrontations with police, and subsequent expressions of pride in January 6 during media appearances, along with deleting FaceBook content);

*United States v. Francis Connor*, Case No. 21-cr-586 (entered Senator's office space and rifled through books and papers, and inflammatory talk on social media, including attempt to steal painting from Capitol amidst "civil war" and the murder of Nancy Pelosi and Mike Pence, resulting in12 months' probation to include 3 months home confinement);

*United States v. Morgan Lloyd*, Case No. 21-cr-164, (36 months' probation, 120 hours community service for woman who entered Capitol and posted about it on social media, claiming one of the best days of her life, and encouraging friend to enter building with her);

*United States v. Griffith*, Case No. 21-cr-204; 3 months' home detention, 36 months' probation for defendant chanting and cheering inside Capitol building, with extensive statements before after the event about what occurred, and who watched others confront law enforcement);

*United States v. Sanders*, Case No. 21-384, 36 months' probation and 60 hours community service for defendant who entered after observing Oath Keepers confront police and tear gas dispersed, took pictures and video insider Rotunda, and made aggravating post-event statements);

*United States v. Bustle*; Case No. 21-cr-238, (60 days home detention, 24 months' probation, 40 hours community service for husband and wife who walked into Capitol with signs about the election and vaccination, extensive statements on social media relating to both, and took pictures inside);

*United States v. Wood*, Case No. 21-cr-223 )12 months' home confinement for defendant convicted of felony obstruction who approached House and Senate

chamber, entered Speaker's office suite and allegedly pushed police, along with extensive social media presence).

Where sentences of incarceration have been imposed, including by this Court, the defendants' actions have typically been more aggravated or has resulted in conviction for more serious, felonious conduct (or both). *See, e.g.*, *David Rhine*, 21-cr-687-RC (entered into Capitol in first wave carrying dangerous weapons, and sought entry into House chamber and gallery, entered House committee office, convicted after jury trial of two felonies, resulting in four months' imprisonment) ; *United States v. Williams*, 22-cr-365-RC, (six month sentence for defendant convicted of trespass and theft of government property after defendant, among first wave into Capitol, stole police bag and riot helmet and participated in pushing Capitol police); *United States v. Gordon*, 22-cr-343-RC, (six-month sentence for defendant convicted of felony civil disorder who threw projectiles at law enforcement and attacked inner Capitol doors, with more aggravated criminal history); *United States v. Camper*, 21-cr-325, (defendant was in "combat mode" while storming Capitol, believing it would be dangerous on the front lines, and then destroyed video footage for fear of incrimination, sentenced to 60 days incarceration).

We do not wish to belabor the point. Sentencing Ms. Bartow to probation will not create any unjust or unwarranted disparities, even accounting for her social media statements. Probation or non-incarceration may not be the norm for January 6 defendants, but nor are such sentences the outliers. It is estimated that over 200 similar defendants have received a sentence that does not involve incarceration.

Ms. Bartow's conduct overall may not make her the least culpable defendant to have entered the Capitol that day, but overall she is much closer to that end of the spectrum, even before factoring in her compelling history and characteristics, and lifetime of good works.

### Ms. Bartow's Remarkable History & Characteristics

As discussed below, and as seen above, Kate is someone who, for better or worse, leaps into the fray. This is often an admirable, commendable trait, and has led to not only great humanitarian work, but to putting herself in harm's way, where angels fear to tread. It has nearly gotten her killed. On January 6, this same characteristic manifested itself negatively. Her psychologist opines that Kate "would 'ride in' fearlessly, believing that she could help people make a better choice even if it were an impossibility in the moment." Exhibit A. The situation called for restraint, contemplation and some degree of timidity. Instead, she entered into the Capitol, and for a brief moment, exhorted or encouraged others to do the same, cheering them on. Her exuberance, enthusiasm and passion, which are part of her makeup, *see* Exhibit C, helped take her too far on this occasion. However, once inside, she became an agent of calm, not chaos. Of order, not disorder. Of de-escalation rather than confrontation. Violence was never part of the equation for Ms. Bartow, either directed against the police, legislators, aides, reporters, or anyone else. That is not who she is, even in her worst moments. Exhibit A.

Ms. Bartow is now 30. To say she has led an unconventional life is an understatement. That life has changed dramatically since the events of January

6th. She has become the manager of a dude ranch in New York, and helps people learn horseback riding and other skills. Exhibit B; https://1000acres.com/. Dr. Bushey, another psychologist, writes glowingly of Kate's work on the ranch that she witnessed firsthand, including with a group of special needs adults, who Kate helped get up on horses. Exhibit C. Undoubtedly, they would take with them cherished memories of trail rides with her, making them feel strong, brave and confident. *Id.* Kate has recently taken on the daughter of a family friend as a ranch hand, who has suffered deep trauma and needed but is "inspired by [Kate's] character to be a hard worker [and is] growing by leaps and bounds." Exhibit J.

Aside from the usual growth and maturity, as well as the fact of being prosecuted and arrested, she has married. Exhibit D. Her husband writes touchingly of how Kate worked hard to reunite him with his long-lost mother and brother. *Id.* Most importantly, she is now a mother to a son who is 18 months old. Her devotion to her son is exemplary. Exhibit J. She knows that any similar conduct will have serious repercussions not just on her own life and freedom, but on her son as well. And that is not an outcome she is willing to countenance. She will accept whatever sentence the Court imposes, but the decisional process that ended up in participating in the events of January 6th at the Capitol is now changed - for good and for the better.

It is impossible to understand Ms. Bartow without an appreciation of her connection to and service of Haiti and its people. It goes to the core of her identity and her beliefs in making the world better. Kate is defined by empathy, compassion

and commitment.  She was born in Indiana, and spent her early years there, also living in Haiti during this period for a time.  Ms. Bartow has Haitian ancestry through her mother's family, and her maternal grandmother was born in Haiti.  At about 5 or 6, Kate moved with her family to Upstate New York.  She was homeschooled, and had three brothers.  Her mother writes of how they were raised "off-grid."  Exhibit E.  She grew up in a rural area of New York, with horses and led a mostly happy childhood, though not without some trauma and being the victim abuse as well.

After earning her GED in about 2009, she began taking college coursework. In 2010, a devastating earthquake struck Haiti, and this changed the trajectory of Kate's life.  Within three days, she flew to Haiti, when others were getting out, and moved in and out of tent cities, treating the injured."  Exhibit E. Her brother writes:

> Thousands of lives have been positively affected by her work in the country. In the earthquake of 2010, Kate, and a team of other Americans, rendered first aid to several hundred injured Haitian people, as well as food, goods, and provisions. No later than 72 hours after the earthquake struck the island, Kate was there to help. While there is no quantifiable number to the amount of lives she and her team saved while volunteering their help, the motive, and characteristics of these acts is without question.

Exhibit F.  Since then, Kate has spent her life back and forth between Haiti and the United States, providing needed services relating to medical care, the provision of supplies, and other humanitarian assistance.  She has held several jobs in the United States, moving between different states before resettling in New York not long ago. However, she has been mostly traveling back and forth between the United States

and mission work in Haiti up until very recently.  In particular, she sought to adopt

two very young children with special needs after both mothers passed away, Kate

having met them through working in hospitals in Haiti.  Tragically, both children

passed away before she could help.

The people who know her best -family, friends and more – describe her in

glowing, almost saintly terms that stand out in the sometimes-bleak universe of

criminal sentencing memoranda:

> Ms. Bartow has demonstrated, on numerous occasions, her willingness
> to place herself in uncomfortable and perilous situations in pursuit of
> helping her fellow man both domestically and abroad. Ms. Bartow has
> served alongside teams in conjunction with completing solo service
> missions in order to aid the devastation that shook Haiti over the last
> decade bringing humanitarian efforts to the tiny Country in addition to
> hope for its people.  Exhibit L.

> Throughout the years, I have watched Katelyn and her family serve
> others in many different capacities.  I recall when a massive earthquake
> hit Haiti, her family organized a relief effort for those affected.  They
> personally ran airplane runs to take supplies, medical provisions, water,
> food and clothing to the people in Haiti who were hurting so desperately.
> They put their lives on the line as travel was difficult and the country
> itself was unstable.  Katelyn, as I have known her throughout the years,
> has always had a heart for others; putting the needs of others before her
> own.  Exhibit J.

> She believes in the power of kindness, gentleness, love and compassion.
> Her career has been made through her work with horses and it is here
> that I find most evident her aversion to violence or abuse of power. She
> does not break these animals; she pairs with them. She earns their trust
> through patience and consistency, presenting with a gentle heart and a
> calm soul. This is also true in the work I have seen her do with the
> humans she surrounds herself with; regardless of identity or belief
> system Kate approaches with the same temperament that she utilizes
> so successfully with horses. She is successful in all that she does because
> of the approach she takes and her willingness to learn. . . . Kate's
> character is one of the finest I have had the pleasure of engaging with

and that she has the capacity to do so much good in this world but not to cause harm or pain to others.   Exhibit A.

From feeding the homeless here in the states to missionary work in foreign countries bandaging wounds, Kate is there. It doesn't take much convincing when the care of others are on the line. . . . Her determination towards the cause of people who are hurting and in need is something in my lifetime that I've never seen before.  Exhibit D.

As a vibrant, brave, beautiful, and compelling person, Kate continued to make an impact wherever she went. She brokered peace during the riots in Haiti, worked disaster relief after the hurricane, raised tens of thousands of dollars for prison ministry and reform and funneled much of her income to people in need.  Exhibit E.

Her selflessness and genuine concern for others shine through in her actions and interactions. Kate consistently goes out of her way to lend a helping hand and offers her support to those in need. Her acts of kindness are a true inspiration and serve as a reminder of the importance of compassion and empathy.  Exhibit N

Katelyn is compassionate and not afraid to give to those in need, as generosity is in her nature. I can't count the amount of times I witnessed her leave a one hundred dollar tip for a waitress after only eating a ten dollar meal. She's quick to lend a helping hand when she knows you're in a tough spot. Within a day of losing my job, she offered me a position at the ranch she was working at. And offered to match the pay to boot. Exhibit F.

I have found myself looking up to the way she treats others with kindness, respect, and generosity. She has gone through incredible lengths in the pursuit of making a positive impact on others lives. Be it something as simple as listening to you when you need to talk, or as far as literally digging survivors from the rubble of a collapsed nation after a devastating earthquake, she does this for You. Me. Them.  Exhibit K.

Kate's character is seen perhaps most clearly in a harrowing episode in 2017 in the aftermath of Hurricane Matthew, when yet another natural disaster struck Haiti and again caused unimaginable suffering.  Kate was there to help yet again. The United States, meanwhile, had sought the extradition on drug and money

laundering charges of a Haitian folk hero, Senator Guy Phillipe.  After he was taken into custody, the local population in the province of *Grande Anse* began rioting, burning buildings, killing people in markets, and hunting down Whites, Americans and other foreigners[6].  It was anything but safe, and everyone who could leave was evacuated.  Not Kate.  She stayed behind to continue her medical volunteer work consisting primarily of wound care, and refused to leave.  However, she was forced to hide out on the roof of a friend's house so that she would not be killed or kidnapped.

After several days, she asked, through an intermediary, to meet the leaders of the local gangs and groups leading the unrest.  She was blindfolded, and taken under cover of darkness to their remote headquarters on the back of a motorcycle, and then meeting again the next day.  She ultimately convinced them that Americans were not their enemies, and did not wish Haitians any harm.  She convinced them to lay down arms and avoid further bloodshed, killings, burnings, violence and reprisals.  She helped organize and lead a peaceful protest against the extradition, marching through town with them all the next day at the head of the column.  She could have been killed, but took a dangerous risk to improve a dangerous, explosive situation.  Just as at the Capitol, her brashness led her into the Lion's Den.  But just as at the Capitol, and at the potential cost of her life on this occasion, she helped make peace and turn away from violence.  It is a remarkable story, as chronicled in

---

[6] https://www.nytimes.com/2017/01/12/world/americas/guy-philippe-haiti-extradite-drug-charges.html

two media articles attached as Exhibits H & I.  Accounts of Ms. Bartow's heroics in Haiti are also available on YouTube, which we invite the Court to view at the links below.[7]

Ms. Bartow did all these things because she believed they had to be done. Not for credit.  Not for a reward or preferential treatment in the afterlife.  Not to signal her virtue on social media.  Not to bank them as a get-out-of-jail-free card in the event she ever needed them.  She did them because she believed they were the right thing to do in the moment.  That said, they are ripe for consideration by the sentencing court too, as Judge Rakoff wisely observed at the dawn of the post-*Booker* era:

> [S]urely, if ever a [wo]man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.

*United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006).  Kate is one of the rare people who, in a shattered, deeply unjust world, actually gives you hope for mankind.

---

[7] https://www.youtube.com/watch?v=om3-wpeSpAs (American Missionary Faces Down Rioting Haitian Gangs); https://www.youtube.com/watch?v=DcX-f5d8Pbw (Christian Missionary Saves Haitian Girl with Massive Leg Wound[]); https://www.youtube.com/watch?v=gcIuI1YP8RA ("Hell:  Christian Missionary's Prison Report Reveals 50-60 Humans Stuffed in Tiny Cells in Haiti"); https://www.youtube.com/watch?v=J_xVpPX- Go (Pray: Shocking Scenes from Haiti Show Devastation in Wake of Earthquake, Tropical Storm).

<u>Conclusions</u>

Ms. Bartow has been on pre-trial release for more than a year now, without any violation.  She was given permission to travel to Jamaica for a wedding, and returned without incident, re-surrendering her passport thereafter.  She is plainly able to follow conditions of release or probation, and we do not expect difficulty on supervised release or probation.  Combined with her lack of criminal history, the Court need not be concerned for committing new offenses or posing any kind of risk to the public.

Probation itself is a significant punishment, and should be viewed as more than simply a proverbial slap on the wrist.  *See Gall v. United States*, 128 S. Ct. 586, 595 (2007) (endorsing district court's characterization of probation as a substantial restriction of freedom); *United States v. Hubel*, 625 F. Supp. 2d 845, 851 (D. Neb. 2008) ("[O]ffenders on probation are subject to several substantial restrictions on their liberty, including provisions requiring that they may not leave the judicial district, move, or change jobs without notifying their probation officer or the court, that they report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, refrain from excessive drinking, and submit to drug testing"); *United States v. Coughlin*, 2008 U.S. Dist. LEXIS 11263, at *22 (W.D. Ark. Feb. 1, 2008) ("Home detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply retributive"); *United States v. Myers*, 353 F. Supp. 2d 1026, 1031 (S.D. Ia. Jan. 26, 2005) ("Probation is not an act

of leniency.  Probation is a substantial restriction of freedom; it is not forgiveness, and it is not an endorsement of the offense").

Further, Ms. Bartow is in a unique position to provide a service to the community through her work at the ranch, particularly with children and adults with special needs.  She will continue this work, whether Court ordered or not. However, it would be more beneficial to everyone if she is able to serve others in this capacity, rather than in a jail or prison cell, and as a potential alternative to incarceration.

Even if Ms. Bartow does not spend another day in custody, she will have paid a significant price and suffered mightily as result of this prosecution.  She has been harassed and shamed publicly and online for her actions that led to being charged. She has been threatened online, and by mail.  She is scared, and has been on edge for over one year.  She has suffered seizures, after not having suffered them before, and has undergone fainting spells and sicknesses which she attributes to the stress of being a criminal defendant for the first time.

Most traumatic was the arrest itself.  Federal agents came to take Ms. Bartow at her residence in New York in October 2022.  She was taken from her son and transported to the federal courthouse in downtown Albany, about an hour and a half from her house.  She was released later that afternoon on conditions, after the Government did not seek her detention.  However, the arrest and temporary separation from her 3-month old caused her and family great stress and anxiety[8].

---

[8] In laying out these facts, we are not attempting to cast blame at the FBI or the U.S. Attorney's Office for the manner in which Ms. Bartow was taken into custody and processed.  To their

She was literally in tears – not because she was arrested and charged, but because of the uncertainty even a temporary separation from her boy had caused.  Her son had, at that point, only nursed, and had not drank from a bottle or had any infant formula.  They did not have a supply of breast milk on hand.  Needless to say, how he would get any nutrition without her was foremost in her mind, and caused tremendous grief and difficulty, even in a condensed time frame.  And the backstory was that her son was born after she had endured multiple miscarriages and the loss of children in Haiti she had tried to rescue.  It was a nightmare.  It is a feeling Kate would never want to experience again, and she would not do anything to put herself in such a scenario again.

Again, we lean on Judge Mehta's wise observation: "People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways as a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence."  Tr. of Cavanaugh Sentencing, at 29.

For the foregoing reasons, we respectfully ask for a sentence involving some component of probation and community service.  Ms. Bartow is better placed to serve her community, her people and her family in a non-incarceration environment.  Participating in the events of January 6th was a lamentable act, but

---

credit, her detention was temporary and her release relatively speedy.  Nevertheless, being apart from her young son, even for a short period of time, was under the circumstances deeply concerning for her.

in the context of her life overall, it does not begin to represent who she is, and what she is about.

November 17, 2023

Respectfully submitted,

LISA PEEBLES
Federal Public Defender

By: /s Jeremy B. Sporn, NDNY # 703650
Assistant Federal Public Defender
Northern District of New York
54 State Street, Suite 310
Albany, New York 12207
518-436-1850
Jeremy_sporn@fd.org